JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Julie Bingham, Derivatively on Behalf of Nominal Defendant Agilon Health Inc.

**(b)** County of Residence of First Listed Plaintiff   Travis
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

The Briscoe Law Firm, P.C., 12700 Park Central DR., STE 520, Dallas, TX 75251, 972-521-6868

## DEFENDANTS

Steven J. Sell, et al.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☒ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 14(a), Section 14a-9, Section 10(b) of the Securities Exchange Act

Brief description of cause:
Shareholder Derivative Action for Insider Trading, Breach of Fiduciary Duties, Unjust Enrichment, and Corporate Waste

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE   Andrew W. Austin      DOCKET NUMBER   1:24-cv-00297-DII

DATE   10/02/2024

SIGNATURE OF ATTORNEY OF RECORD   /s/Willie C. Briscoe

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

## Attorneys for Plaintiff

**The Briscoe Law Firm, P.C.**
Willie C. Briscoe (Local Counsel)
12700 Park Central Drive, Suite 520
Dallas, Texas 75251
(972) 521-6868
Facsimile: (346) 214-7463
Email: wbriscoe@briscoelawfirm.com

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516
tjm@rl-legal.com
sa@rl-legal.com

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| JULIE BINGHAM, Derivatively on Behalf of Nominal Defendant AGILON HEALTH INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| STEVEN J. SELL, RONALD A. WILLIAMS, RAVI SACHDEV, SILVANA BATTAGLIA, SHARAD MANSUKANI, DIANA L. MCKENZIE, KAREN MCLOUGHLIN, WILLIAM WULF, MICHELLE A. GOURDINE, MICHAEL L. SMITH, CLAY RICHARDS, RICHARD J. SCHNALL, DEREK L. STRUM, JEFFREY A. SCHWANEKE, TIMOTHY S. BENSLEY, GIRISH VENKATACHALIAH, and HEIDI HITTNER, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| AGILON HEALTH INC., | ) ) ) | |
| Nominal Defendant. | | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Julie Bingham ("Plaintiff"), by and through her undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant agilon health inc. ("agilon" or the "Company"), against certain of the Company's executive officers and its Board of Directors (the "Board") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by her counsel, including review of publicly available

information regarding the Company; the allegations of a class action complaint filed in the Securities Class Action captioned *In re Agilon Health, Inc. Sec. Litig.,* Case No. 1:24-cv-00297-DII (W.D. Tex. Mar. 19, 2024); (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by agilon; legal filings; news reports; and securities analysts' reports about the Company.

## **NATURE OF THE ACTION**

1.      This shareholder derivative action is brought on behalf of agilon against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least April 15, 2021 and February 27, 2024, inclusive (the "Relevant Period"), and for violations of the federal securities laws caused by the issuance of materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements. The Individual Defendants' wrongdoing has exposed the Company to massive potential liability to the class, as well as the significant defense costs in the Securities Class Action, as set forth below.

2.      agilon is a healthcare and technology company based in Austin, Texas, that acts as an intermediary between insurers and medical providers. Specifically, under the Company's "Total Care Model," agilon enters into agreements with Medicare Advantage health plans ("payors"), whereby the Company assumes full liability for all expenses related to the provision of medical services in exchange for a payment from the health plan. This allows the health plan to offload the full financial risk to agilon.

3.      To fulfill its obligations under these agreements, the Company enters into concurrent, long-term agreements with medical providers, whereby agilon shares the proceeds

from its health plan agreements with physicians who provide medical services to the Company's patients. The profit margins of both agilon and its physician partners are therefore determined by the difference between the payment received by Medical Advantage health plans and the cost of the medical care ultimately provided to patients.[1]

4.      Accordingly, it is crucial for the Company to closely monitor patient medical expenses and utilization rates in order to maintain visibility into its cash flows and profitability.

5.      To sustain revenue growth, agilon's business model involves increasing the number of physicians on its platform by partnering with physicians in new geographic regions and by adding new physicians in the Company's existing, or "mature" markets. This requires thoroughly onboarding and educating new physicians with respect to cost management and to Company personnel and resources available to new physicians.

6.      With the onset of the COVID-19 pandemic in early 2020, utilization of "non-essential" healthcare services declined substantially, which decreased the Company's liabilities under its Total Care Model health plan agreements. By May 2023 however, the Company had begun to experience increasing utilization rates and medical costs, which drove down the Company's margins and profitability.

7.      Throughout the Relevant Period, certain of the Company's officers and directors issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) utilization rates and medical expenses began increasing in May 2023, and the Company's liabilities for costs of medical services was significantly understated; (ii) agilon failed to provide new

---

[1] The difference between medical services revenue and medical services expenses is one of agilon's key performance indicators and is herein referred to as the Company's "medical margin."

physicians in mature markets with necessary onboarding and training; (iii) the Company had significant data visibility gaps and failed to adequately monitor medical costs and medical margins; and (iv) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

8.   The truth slowly started to emerge on November 2, 2023, when the Company revealed that its margins had been adversely impacted by a surge in utilization rates and medical costs.

9.   On January 5, 2024, agilon further revealed that its margins were driven down by the Company's failure to adequately onboard and educate new physicians that had joined agilon's mature markets.

10.   The full truth emerged on February 27, 2024, when the Company reported substantial medical costs for its fiscal year 2023 that were previously undisclosed. agilon further disclosed that it had been experiencing significant data visibility gaps, and the Company lowered its already disappointing fiscal year 2024 guidance.

11.   As a result of the disclosures, the price of agilon stock declined precipitously, harming shareholders and the Company.

12.   As a result of the foregoing, the Securities Class Action was filed against agilon and certain of its executive officers, exposing the Company to massive class-wide liability.

13.   As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

14.     Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) and Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b)(1), as agilon maintains its principal executive offices in this District and a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District.

## PARTIES

*Plaintiff*

20.     Plaintiff is, and has been at all relevant times, a shareholder of agilon.

*Nominal Defendant*

21.     Nominal Defendant agilon is incorporated under the laws of the State of Delaware.

22.     The Company's principal executive offices are located at 6210 East Highway 290, Suite 450, Austin, Texas 78723. agilon's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "AGL."

***Individual Defendants***

23.     Defendant Steven J. Sell ("Sell") has served as agilon's Chief Executive Officer ("CEO"), President, and as a member of the Board since June 2020. Defendant Sell was named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Sell received $5,267,036 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Sell beneficially owned 3,774,968 shares of agilon common stock, worth roughly $22 million.[2] During the Relevant Period, while the price of agilon stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Sell made the following sale of personal holdings of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|-----------------|------------------|----------|
| 9/14/2021 | 100,000 | $28.98 | $2,898,000 |

24.     Defendant Ronald A. Williams ("Williams") co-founded agilon and has served as chairman of the Board since 2017. Defendant Williams additionally served as an Operating Advisor for CD&R. According to the Company's public filings, Defendant Williams received $160,002 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Williams beneficially owned 3,564,414 shares of agilon common stock, worth roughly $20.8 million.

25.     Defendant Ravi Sachdev ("Sachdev") has served as a member of the Board since

---

[2] Valuations of the Individual Defendants' personal holdings of Company stock are calculated based on the $5.84 per share closing price of agilon common stock on April 1, 2024.

2017 and as Vice Chairman of the Board since January 2021. Defendant Sachdev additionally serves as a partner at CD&R.

26.     Defendant Silvana Battaglia ("Battaglia") has served as a member of the Board since June 2023. According to the Company's public filings, Defendant Battaglia received $374,851 in 2023 in compensation from the Company.

27.     Defendant Sharad Mansukani ("Mansukani") has served as a member of the Board since 2017. According to the Company's public filings, Defendant Mansukani received $245,002 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Mansukani beneficially owned 1,885,664 shares of agilon common stock, worth roughly $11 million. During the Relevant Period, while the price of agilon stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Mansukani made the following sale of personal holdings of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 9/14/2021 | 156,250 | $28.98 | $4,528,125 |

28.     Defendant Diana L. McKenzie ("McKenzie") has served as a member of the Board since February 2023 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant McKenzie received $405,440 in compensation from the Company. As of March 31, 2024, Defendant McKenzie beneficially owned 10,364 shares of agilon common stock, worth roughly $60,526.

29.     Defendant Karen McLoughlin ("McLoughlin") has served as a member of the Board since July 2021 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant McLoughlin received $292,502 in compensation from the Company. As of March 31, 2024, Defendant McLoughlin beneficially owned 21,299 shares of agilon common

stock, worth roughly $124,386.

30.    Defendant William Wulf ("Wulf") has served as a member of the Board since 2017 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Wulf received $230,002 in compensation from the Company. As of March 31, 2024, Defendant Wulf beneficially owned 449,014 shares of agilon common stock, worth roughly $2.6 million. During the Relevant Period, while the price of agilon stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Wulf made the following sales of personal holdings of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 9/14/2021 | 15,342 | $28.98 | $444,611 |
| 3/15/2022 | 30,808 | $19.11 | $588,586 |
| 3/15/2023 | 80,000 | $23.82 | $1,905,200 |
| **Total** | **126,150** | | **$2,938,397** |

*Former Director Defendants*

31.    Defendant Michelle A. Gourdine ("Gourdine") served as a member of the Board from January 2017 until December 2022. According to the Company's public filings, Defendant Gourdine received $389,987 in 2021 in compensation from the Company.

32.    Defendant Michael L. Smith ("Smith") served as a member of the Board from 2017 until August 2022. According to the Company's public filings, Defendant Smith received $254,988 in 2021 in compensation from the Company. During the Relevant Period, while the price of agilon stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Smith made the following sale of personal holdings of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 5/25/2022 | 145,874 | $19.53 | $2,849,459 |

33.     Defendant Clay Richards ("Richards") served as a member of the Board from January 2021 until June 2023. According to the Company's public filings, Defendant Richards received $389,987 in 2021 in compensation from the Company.

34.     Defendant Richard J. Schnall ("Schnall") served as a member of the Board from 2017 until June 2023. Defendant Schnall additionally served as co-President of CD&R during the Relevant Period.

35.     Defendant Derek L. Strum ("Strum") served as a member of the Board from 2017 until June 2023. Defendant Strum additionally served as a partner at CD&R during the Relevant Period.

***Officer Defendants***

36.     Defendant Jeffrey A. Schwaneke ("Schwaneke") has served as the Company's Chief Financial Officer ("CFO") since July 1, 2024. Prior to that, Defendant Schwaneke served as a member of the Board from August 2022 until July 2024. According to the Company's public filings, Defendant Schwaneke received $230,002 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Schwaneke beneficially owned 35,157 shares of agilon stock, worth $205,317.

37.     Defendant Timothy S. Bensley ("Bensley") served as the Company's CFO from January 2021 until January 5, 2024. According to the Company's public filings, Defendant Bensley received $1,750,039 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Bensley beneficially owned 364,725 shares of agilon stock, worth roughly $2.1 million. Defendant Bensley is named as a defendant in the Securities Class Action.

38.     Defendant Girish Venkatachaliah ("Venkatachaliah") has served as agilon's Chief Technology Officer ("CTO") since January 2021. According to the Company's public filings, Defendant Venkatachaliah received $2,880,218 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Venkatachaliah beneficially owned 216,173 shares of agilon stock, worth roughly $1.3 million. Defendant Venkatachaliah is named as a defendant in the Securities Class Action.

39.     Defendant Heidi Hittner ("Hittner") serves as Executive Vice President, chief of staff, within the office of the CEO at agilon. Prior to this role, Defendant Hittner served as the Company's Senior Vice President, Provider Strategies and Growth from January 2019 until February 2022 and as Chief Experience Officer from February 2022 until the end of the Relevant Period. Defendant Hittner is named as a defendant in the Securities Class Action.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

40.     Because of their positions as officers and/or directors of agilon, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed agilon and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner at all relevant times.

41.     Therefore, the Individual Defendants were required to act in furtherance of the best interests of agilon and its shareholders.

42.     Each director and officer of the Company owes to agilon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

43.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of agilon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of agilon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

45.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, earnings, internal controls, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's predatory sales practices, and the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

46.     To discharge their duties, the officers and directors of agilon were required to

exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of agilon were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to agilon's own Code of Conduct;

(b)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

(d)     Remain informed as to how agilon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of agilon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that agilon's operations would comply with all applicable laws and agilon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

47.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by agilon.

48.     At all times relevant hereto, the Individual Defendants were the agents of each other and of agilon and were at all times acting within the course and scope of such agency.

49.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

52.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

53.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of agilon, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of agilon and at all times acted within the course and scope of such agency.

## AGILON'S CODE OF CONDUCT

56.     agilon's Code of Conduct begins with a message from Defendant Sell, which states,

in pertinent part:

> As part of our commitment to being a trusted partner to our physician groups and to support our ability to achieve long-term success, we have adopted this Code of Conduct. This document applies to all of us. All employees of agilon health are responsible for knowing the Code of Conduct and for abiding by the high legal, ethical, and moral standards it contains. In addition, every employee of agilon health is required to be familiar with and comply with all federal and state laws, rules, and regulations that govern their role within the organization. If you are unfamiliar with any of these standards or rules, it is your obligation to ask. Not knowing the rules or turning a blind eye to activities you are not comfortable with is not acceptable and violates our Code of Conduct.

> We are all accountable for upholding these principles and behaviors in accordance with the highest ethical and legal standards. Our Code of Conduct obligates us to avoid any conduct that goes against these principles and standards — or any conduct that even raises the appearance of impropriety — and to hold ourselves to even higher ethical standards than the legal rules require. Breaches of our Code of Conduct will be taken very seriously.

57. The Code of Conduct applies to "all directors, officers, and employees" of the Company and violations of the Code of Conduct will lead to "disciplinary action, up to and including termination."

58. Discussing the Company's "Mission and Values," the Code of Conduct states, in pertinent part:

> You are expected not only to act in compliance with all applicable laws and regulations but also to avoid any behavior that raises the appearance of misconduct. While the legal rules are important to follow, we strive to hold ourselves to higher ethical standards.

> In short, we do not and will not allow any form of unlawful or unethical behavior by anyone associated with agilon health. We expect and require you to be law-abiding, honest, trustworthy, and fair in all your business dealings

59. In a subsection titled "Retention of Records," the Code of Conduct states, in pertinent part:

> We are committed to keeping complete and accurate records in compliance with sound business practices and applicable laws and regulations. All employees must retain records in accordance with agilon health's Record Retention policy and must

seek guidance from the Compliance Office when unsure of if and/or how to retain records.

60.     With respect to legal compliance, the Code of Conduct states, in pertinent part:

Understand and follow the laws, rules, and regulations that govern agilon's business, including insider trading laws that prohibit the use of material, non-public information when trading in or recommending Company securities. You may not trade in Company securities based on material, non-public information ("Insider Trading"). Further, if you have material, non-public information, you may not communicate such information to third parties ("Tipping").

## AGILON'S AUDIT COMMITTEE CHARTER

61.     agilon's Audit Committee Charter states that the primary purposes of the Audit Committee are:

(a) to assist the Board in overseeing (i) the quality and integrity of the Corporation's financial statements, (ii) the qualifications, independence and performance of the Corporation's independent auditor, (iii) the execution of the Corporation's internal audit function, (iv) the accounting, financial and external reporting policies and practices of the Corporation, and (v) the Corporation's compliance with legal and regulatory requirements as such requirements pertain to the accounting, financial and external reporting policies and practices of the Corporation ; and (b) to prepare the report of the Committee required to be included in the Corporation's annual proxy statement under the rules of the U.S. Securities and Exchange Commission (the "SEC").

62.     In a subsection titled "***Reports to Board; Review of Committee Performance and Charter***," the Audit Committee Charter states that the Audit Committee "shall report regularly to the Board and review with the Board any issues that arise with respect to[ ] the quality or integrity of the Corporation's financial statements."

63.     With respect to financial reporting and disclosure matters, the Audit Committee Charter states:

(k)     The Committee shall meet to review and discuss the Corporation's annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the results of the independent auditor's reviews of the quarterly

financial statements, including any difficulties encountered or significant disagreements with management and management's responses to such matters.

(l)     The Committee shall review and discuss with management and the independent auditor:

* * *

(iii)     analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

* * *

(vii)     management's internal control report prepared in accordance with rules promulgated by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act, as amended, and Item 308 of Regulation S-K

* * *

(m)     The Committee shall recommend to the Board whether the annual audited financial statements should be included in the Corporation's Annual Report on Form 10-K.

(n)     The Committee shall prepare, review and approve the report of the Committee required by the SEC to be included in the Corporation's annual proxy statement.

(o)     The Committee shall review and discuss with management the Corporation's practices regarding earnings press releases and the provision of financial information and earnings guidance by management to analysts and ratings agencies.

(p)     The Committee shall periodically review and discuss with management the Corporation's guidelines and policies with respect to the process by which the Corporation undertakes risk assessment and risk management, including discussion of the Corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures. Such risks and exposures include, but are not limited to, threatened and pending litigation, claims against the Corporation or any of its subsidiaries and any regulatory or governmental authorities, and matters that could materially impact the Corporation's internal control over financial reporting.

(q)     The Committee shall review and discuss with the CEO and CFO the procedures undertaken in connection with the CEO and CFO certifications for the Corporation's Annual Reports on Form 10-K and Quarterly Reports on Form 10-

Q, including their evaluation of the Corporation's disclosure controls and procedures and internal controls.

## SUBSTANTIVE ALLEGATIONS

*Background*

64.     agilon was formed in July 2016 by private equity firm Clayton, Dubilier & Rice, LLC ("CD&R"). As of the beginning of 2021, CD&R retained 69% of agilon's outstanding shares and the power to appoint the Chairman of agilon's Board and other Board members.

65.     agilon is a healthcare and technology company based in Austin, Texas, that acts as an intermediary between insurers and medical providers. Pursuant to the Company's Total Care Model, agilon enters into agreements with Medicare Advantage health plans, whereby the Company assumes full liability for all expenses related to the provision of medical services in exchange for a payment from the health plan. This allows the health plan to offload the full financial risk to agilon.

66.     To fulfill its obligations under these agreements, the Company enters into concurrent, long-term agreements with medical providers, whereby agilon shares the proceeds from its health plan agreements with physicians who provide medical services to the Company's patients. The profit margins of both agilon and its physician partners are therefore determined by the difference between the payment received by Medical Advantage health plans and the cost of the medical care ultimately provided to patients.

67.     Accordingly, it is crucial for the Company to closely monitor patient medical expenses and utilization rates in order to maintain visibility into its own cash flows and profitability.

68.     To sustain revenue growth, agilon's business model involves increasing the number of physicians on its platform by partnering with physicians in new geographic regions and by

adding new physicians in the Company's mature markets. This requires thoroughly onboarding and educating new physicians with respect to cost management and to Company personnel and resources available to new physicians.

69.    With the onset of the COVID-19 pandemic in early 2020, utilization of "non-essential" healthcare services declined substantially, which decreased the Company's liabilities under its Total Care Model health plan agreements. This boost to agilon's margins provided CD&R an opportunity to monetize its equity stake in the Company via an initial public offering ("IPO").

70.    On March 18, 2021, agilon filed a Registration Statement on Form S-1 with the SEC in connection with its IPO (the "April 2021 Registration Statement"). On April 14, 2021, the Registration Statement was declared effective by the SEC, and shares of the Company's common stock began publicly trading on the NYSE under the ticker symbol "AGL."

71.    On April 16, 2021, agilon filed a prospectus on Form 424B4 with the SEC in connection with its IPO which incorporated and formed part of the Registration Statement (the "April 2021 Prospectus and, together with the April 2021 Registration Statement, the "April 2021 Offering Documents"). Through the IPO, the Company sold $1.2 billion shares of agilon stock, at a price of $23 per share.

***Individual Defendants' False and Misleading Statements***

72.    Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company's margins were being driven down by heightened demand for surgical procedures and other medical services; (ii) utilization rates and medical expenses were increasing, and the Company's liabilities for costs of medical services was significantly understated; (iii) agilon failed to provide new physicians in

mature markets with necessary onboarding and training; (iv) the Company had significant data visibility gaps and failed to adequately monitor medical costs and medical margins; and (v) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

73. The Company's April 2021 Registration Statement touted the Company's data analytics capabilities:

> Our purpose-built and flexible platform enables ease of integration with payor systems, physician EMR systems, labs, pharmacies and other third-party platforms, encompassing millions of data records each month. The agilon platform extracts needed financial, clinical and social determinants data and organizes this disparate data to enable easy consumption by physicians in order to improve quality of care, cost and patient experience.

74. Describing the Company's "purpose-built" model, the April 2021 Registration Statement stated that it "provides the necessary capabilities, capital and business model for existing physician groups to create a Medicare-centric, globally capitated line of business." The April 2021 Registration Statement further boasted that the Company's model was "successfully improving quality care and reducing costs."

75. The April 2021 Registration Statement stated that the Company's model "results in growing and recurring revenue stream and provides significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups."

76. The April 2021 Registration Statement further touted the Company's model and the purported sustainability of the Company's margin growth:

> Two critical factors that enhance our ability to improve medical margin over a long period of time that we believe are unique to our model are . . . (ii) our ability to deliver actionable insight at the patient and physician level through our aligned partnership model with peer-to-peer physician feedback driving accountability and accelerating the pace of change to a Total Care Model.

77. The April 2021 Registration Statement further touted the Company's "ability to add

new physician partners and to attract additional PCPs to our physician partners."

78.     On May 26, 2021, the Company announced financial results and filed a quarterly report on Form 10-Q for its first fiscal quarter of 2021 (the "1Q21 10-Q"). The 1Q21 10-Q reported $52 million in medical margin and $4 million in adjusted EBITDA for the quarter and repeated the materially false and misleading statement concerning the Company's business model that was contained in the April 2021 Registration Statement identified above in ¶74.

79.     On May 27, 2021, during an investor conference call, Defendant Sell highlighted the Company's "growth strategy, both with our existing partners and current geographies and with new partners in new markets" and represented that the Company maintained a "high degree of visibility into future revenues and margin progression."

80.     Defendant Sell emphasized the Company's "[s]ame geography membership growth" as "a key differentiator in our model," and explained that "same geography growth is driven" in large part by "new physicians joining our anchor partner . . . result[ing] in a highly efficient growth model with extremely strong returns on investment." Defendant Sell reiterated during the call that the Company derived substantial growth from "new physicians joining into . . . existing markets."

81.     On June 8, 2021, at the Goldman Sachs Global Healthcare Conference, Defendant Sell maintained that "adding physicians on the platform is an area of tremendous opportunity" and that the Company's "real outsized [growth] lever is in the same-geography growth." During the conference, Defendant Sell emphasized that the Company's "same-geography growth is a big differentiator. . . . But back to that partnership [with physicians], just like everything we do, it works very well in terms of adding physicians in these communities."

82.     During the conference, Defendant sell touted the Company's data analytics

capabilities:

> We've taken an incredible amount of data today. We've gone from 9 to now 16 health plan relationships. Every time we go in, there's different EMRs that we're integrating with, so the data growth has been logarithmic. And our job is to provide that in a clean and actionable way to the primary care physician, where they can have really kind of a scaled total care model type of relationship with their patients. . . . That comes from providing really clean and actionable data, working with your partner to get them comfortable around that.

83. On August 4, 2021, the Company announced financial results and filed a quarterly report on Form 10-Q for its second fiscal quarter of 2021 (the "2Q21 10-Q"). The 2Q21 10-Q reported $55 million in medical margin and ($2 million) in adjusted EBITDA for the quarter and repeated the materially false and misleading statement concerning the Company's business model that was contained in the April 2021 Registration Statement identified above in ¶74.

84. On August 5, 2021, during an investor conference call, Defendant Sell stated that the Company's "same geography growth approach is distinctive and highly efficient as it is driven by . . . new physicians joining our anchor partners on the platform."

85. On September 7, 2021, in connection with a secondary public offering ("SPO"), agilon filed a Registration Statement on Form S-1 (the "September 2021 Registration Statement"). The September 2021 Registration Statement repeated the same false and misleading statements that were contained in the April 2021 Registration Statement and was used to sell 19.5 million shares of agilon stock at a price of $30 per share, including 17.9 million shares sold by CD&R.

86. On October 28, 2021, agilon issued a press release announcing the Company's financial results for the third fiscal quarter of 2021 (the "3Q21 Release"). The 3Q21 Release quoted Defendant Sell touting the Company's "high-visibility partnership model," which he claimed "deliver[s] predictable, quality outcomes." The same day, the Company filed a quarterly report on Form 10-Q with the SEC, which reported a $43 million in medical margin and ($14 million) in

adjusted EBITDA for the quarter and repeated the materially false and misleading statement concerning the Company's business model that was contained in the April 2021 Registration Statement identified above in ¶74.

87.     On October 29, 2021, the Company hosted an investor conference call to discuss its third quarter 2021 financial results. With respect to the Company's business model, Defendant Sell stated that its ability to "drive medical margin improvements and predictable quality outcomes, despite macro volatility, is a function of our platform and physician-centric partnership model," adding "we're just really encouraged about our ability to drive predictable quality outcomes in a volatile market." Defendant Sell further highlighted the Company's ability to "drive sustainably lower cost[s]."

88.     During the conference call, Defendant Sell reiterated that "strong momentum in same-geography growth" would "drive our growth for a long time" and maintained that same-geography growth was sustainable:

> What's becoming a growing piece of this is this improvement in access and other physicians joining locally. That's the biggest part of that 20% to 40-plus percent growth in MA and 45% growth overall in terms of membership is really the visibility. We know who those groups are that are joining in January. We know those groups are who are joining further out in the year. The timing might slide a quarter one way or other, but we have – those groups are effectively in an implementation period of their own right now. And so that visibility forward to '22 and even into '23 is really pretty strong around that. And that will be a continued driver of same geography growth. That's why we've talked about low to mid-teens same geo growth on a kind of sustainable basis.

89.     On November 18, 2021, at the Wolfe Research Healthcare Conference, Defendant Sell maintained that the Company would be able to sustain its growth by adding "more and more physicians joining in locally in the markets that we're in."

90.     On January 10, 2022, at the JP Morgan Healthcare Conference, Defendant Sell touted the Company's "high-touch primary care model":

*I think our high-touch primary care model really distinguishes us. We've been able to manage costs and deliver predictable results through each one of these surges.* We've been able to maintain those touchpoints. And so we don't see the volatility in our RAF that perhaps you do in other models.

\* \* \*

[T]he quality of our economic model has allowed us and will continue to allow us to deliver *predictable results in periods of volatility. No one can predict exactly what the future is with this pandemic, but we know that we can deliver predictable results. New government programs evolve over time, but we can deliver predictable results.*"

91.     In response to a question about "pent-up demand around things like elective surgeries" among agilon's patients, Defendant Sell stated:

> I don't know that we believe there's a massive set of pent-up demand, particularly in our model, because we've got those touchpoints, and we've been working very closely with those senior patients, particularly those high-risk patients. That's why that 50% increase in terms of touches with those patients yields such positive results.

92.     During the conference, Defendant Sell again touted the purported sustainability of the Company's revenue growth:

> *We have a very predictable and highly visible growth algorithm.* We grow in new geographies and we grow in same geographies. . . . Once we're in a geography, we're able to consistently deliver growth rates in the low to mid-teens. That comes, both from an organic perspective of patients in the practice . . . and adding additional physicians.

93.     On March 3, 2022, agilon issued a press release announcing the Company's fourth quarter and full year 2021 financial results (the "2021 Release"). The 2021 Release quoted Defendant Sell stating that "looking ahead to 2022, we expect to generate significant gains in profitability while maintaining strong growth in membership and revenue." The 2021 Release reported a $182 million in medical margin and ($14 million) in adjusted EBITDA for the year and repeated the materially false and misleading statement concerning the Company's business model that was contained in the April 2021 Registration Statement identified above in ¶74.

24

94.     The same day, the Company filed its 2021 annual report on Form 10-K with the SEC (the "2021 10-K"), which was signed by Defendants Sell, Bensley, Sobotka, Williams, Sachdev, Gourdine, Mansukani, Richards, Schnall, Smith, Strum, Wulf, and McLoughlin. The 2021 10-K stated that as the Company's "platform matures over time, we expect medical margin to increase in absolute dollars."

95.     The 2021 10-K stated the following with respect to the "Data Integration and Management" capabilities of the Company's platform:

> Data Integration and Management: Integration with health plan systems, physician electronic medical record ("EMR") systems, labs, pharmacies and other third-party platforms to organize disparate data into actionable insights for our PCPs to improve quality of care, cost and patient and physician experience.

96.     The 2021 10-K reiterated that the Company has "significant visibility into the near-term and long-term financial trajectory for both agilon and our anchor physician groups."

97.     On March 11, 2022, at agilon's 2022 Investor Day, Defendant Sell stated the following:

> But that national scale gives us tremendous benefit with payers, right? The integration that we're seeing with our largest payers, the joint operating committees, we have standard data formats with them. We are talking about expanding into other geographies. We have the ability to bring a national payer into a market literally within 6 to 8 weeks like we did in Buffalo with a couple of national payers.

98.     Defendant Venkatachaliah touted the Company's data analytics capabilities:

> This platform that we talk about, the thing that we do is we are able to take data from all of these diverse sources. We stitch it together in what we call as the member information profile and construct a single longitudinal view of that patient across their entire landscape.
>
> * * *
>
> Firstly, we are consistent across payers. Most people don't realize how varied the information is that they get from payers. The fact that we threaded together and we are consistent, and they know exactly the same place to look for chronic conditions,

the same place to look for a med list, same place to look for a problem list makes it so much easier for them.

The second thing they love is that we slipstream this into their existing workflows, into their EMRs . . . they don't have to learn anything new. They don't have any training costs associated with it. They start to see the information in context of all the things and exactly how they're been [sic] practicing medicine over the last x number of years.

99.     Defendant Venkatachaliah represented that the Company's physician partners "trust the data" they receive from the Company:

Is that not just do we deliver this information, we actually listen to feedback of our doctors. If our data is wrong or something is incorrect, we work to get that corrected. If we don't deliver it into the right workflow, we make it sure that it does get delivered better, right? And the fact that they don't have to learn a new system and many of your investors, it feeds into the fact that we have low capital cost. We don't have to buy them an EMR or buy them some system or have them buy software. It lowers capital costs. ***The thing that's really beautiful about this is that they trust the data. They trust the data.***

100.     With respect to the Company's relationship with payors, Defendant Hittner stated that agilon's "standard data sharing agreements" with payors "allows us to move very rapidly into new geographies[,] [s]o as we expand with new partners, we can move very quickly with these national relationships."

101.     Defendant Hittner continued, touting the purported benefits of the Company's platform regarding data accessibility:

Imagine you're getting all of your data about your senior population now from all of your MA plans in one spot, you combine that with your EMR data . . . . Now you have the ability to see a view of your senior panel and their holistic journey, you never had access to before. And it's simple. It's all in one spot that you can access that. And so we are able to move the community to value.

102.     On April 11, 2022, the Company filed a Proxy Statement on Form DEF 14A with the SEC (the "2022 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Schnall, Mansukani, Smith, and Richards to serve another three-year term on the

Company's Board and the compensation of certain of the Company's executive officers, including

Defendants Sell, Bensley, and Venkatachaliah.

103.    With respect to risk oversight, the 2022 Proxy stated:

> Our board of directors as a whole has responsibility for overseeing our risk management. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by reports from our management team and from our internal audit department that are designed to provide visibility to the board of directors about the identification and assessment of key risks and our risk mitigation strategies. The full board of directors has primary responsibility for evaluating strategic and operational risk management, and succession planning. Our Audit Committee has the responsibility for overseeing our major financial and accounting risk exposures and the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk. Our Compensation and Human Capital Committee evaluates risks arising from our compensation policies and practices, as more fully described below. Our Compliance and Quality Committee evaluates risks arising from our compliance with regulatory and legal requirements that pertain to the conduct of the day-to-day operations of our businesses (such as those dealing with Medicare, patient confidentiality, and other healthcare regulatory matters) and meets regularly with our chief compliance officer. The Audit Committee, Compensation and Human Capital Committee, and Compliance and Quality Committee provide reports to the full board of directors regarding these and other matters.

104.    The 2022 Proxy stated the following with respect to the Audit Committee's role

regarding oversight of the Company's internal controls and financial reporting processes:

> The principal purpose of the Audit Committee is to assist the board of directors in its oversight of our accounting practices, system of internal controls, audit processes, and financial reporting processes. The Audit Committee is responsible for appointing and retaining our independent auditor and approving the audit and non-audit services to be provided by the independent auditor, as well as overseeing the performance of the Company's internal audit function. The Audit Committee's function is more fully described in its charter.

> Our management is responsible for preparing our financial statements and ensuring they are complete and accurate and prepared in accordance with generally accepted accounting principles. Ernst & Young LLP, our independent registered public accounting firm for the year ended December 31, 2021, was responsible for performing an independent audit of our consolidated financial statements and expressing an opinion on the conformity of those financial statements with generally accepted accounting principles.

The Audit Committee has reviewed and discussed our audited financial statements for the year ended December 31, 2021 with management and with Ernst & Young LLP. These audited financial statements are included in our Annual Report on Form 10-K for the year ended December 31, 2021.

The Audit Committee has also discussed with Ernst & Young LLP the matters required to be discussed by Auditing Standard No. 16 adopted by the Public Company Accounting Oversight Board (United States) regarding "Communications with Audit Committees."

The Audit Committee also has received and reviewed the written disclosures and the letter from Ernst & Young LLP required by applicable requirements of the Public Company Accounting Oversight Board regarding Ernst & Young LLP's communications with the Audit Committee concerning independence and has discussed with Ernst & Young LLP its independence from us.

Based on the review and discussions described above, the Audit Committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2021 for filing with the SEC.

105.    The statements contained in the 2022 Proxy were materially false and misleading because they failed to disclose the Company's increasing utilization rates and medical costs, the Company's failure to adequately onboard new physicians, and the Company's significant data and visibility gaps. Further, despite the 2022 Proxy's descriptions of the Board's and its committees' oversight responsibilities with respect to risk management and internal controls over financial reporting, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to issue false and misleading statements.

106.    On May 5, 2022, the Company announced financial results and filed a quarterly report on Form 10-Q for its first fiscal quarter of 2022 (the "1Q22 10-Q"). The 1Q22 10-Q reported $86 million in medical margin, $12 million in adjusted EBITDA, and $1 million in net income for the quarter and repeated the materially false and misleading statement concerning the Company's business model that was contained in the April 2021 Registration Statement identified above in

¶74.

107.    On May 11, 2022, at the Bank of America Healthcare Conference, Defendant Sell stated that the Company has "great visibility from a cost perspective":

> I mean I think one of the real differentiators in our model is in the high-touch nature between the primary care physician and the patient. Our patients have been with our doctors for a decade or more, and they'll be with them typically for another decade. And so we understand those groups very well. As we bring them on board, *we have great visibility from a cost perspective* because we've got that experience with them. We take a 12-month implementation period, which I think is distinctive. And the key is to make sure that we hit day one, year one with a very clear idea around their burden of illness, which is both important on the revenue side and from a care management perspective. *And so that visibility and that continuity is a big differentiator.*
>
> In COVID, what we were able to maintain was the touch points with these senior patients. . . . And I think that translated into more predictably from a cost perspective, we didn't see a big movement on the revenue side in terms of RAF because we were able to maintain those touch points. And *we're also not seeing a huge step-up in terms of pent-up demand because we were able to maintain that touch and make sure there wasn't a huge amount of deferred issues.*

108.    On June 8, 2022, at the William Blair Growth Stock Conference, Defendant Bensley assured investors that "[w]e have tremendous visibility into both growth and embedded margins in our existing PCP groups."

109.    On August 4, 2022, the Company announced financial results and filed a quarterly report on Form 10-Q for its second fiscal quarter of 2022 (the "2Q22 10-Q"). The 2Q22 10-Q reported $82 million in medical margin, $7 million in adjusted EBITDA, and $21 million in net loss for the quarter and repeated the materially false and misleading statement concerning the Company's business model that was contained in the April 2021 Registration Statement identified above in ¶74.

110.    On September 8, 2022, at the Wells Fargo Healthcare Conference, Defendant Bensley stated:

> Our model is basically one about really strong growth, bringing new PCPs and new

members onto the platform. Really having a great – aligned set of PCPs, the model aligning them to basically drive significantly improved cost and quality outcome for the members. So that's driving the margin part of it at the end of the day.

111.    On September 14, 2022, at the Morgan Stanley Global Healthcare Conference, Defendant Sell stated the following with respect to the Company's visibility into medical costs:

[Two] points I would add that I think is kind of distinctive about our model that allows us to deliver really predictable costs kind of quarter in, quarter out, and the year-over-year trends that you've seen in us being able to expand medical margin, is largely based on how well we've done on the cost side. But the 2 things are: one, we work with existing doctors and existing patients and we take them through a 12-month implementation period. So when they go live, we have a very good idea of what that cost structure looks like and a very good idea along -- what the revenues like. But the second piece that I think is really important is, we have this high-touch model.

112.    On November 3, 2022, the Company announced financial results and filed a quarterly report on Form 10-Q for its third fiscal quarter of 2022 (the "3Q22 10-Q"). The 3Q22 10-Q reported $76 million in medical margin, ($5 million) in adjusted EBITDA, and $31 million in net loss for the quarter and repeated the materially false and misleading statement concerning the Company's business model that was contained in the April 2021 Registration Statement identified above in ¶74.

113.    The same day, Defendant Sell stated the following during an investor conference call:

[W]e are experiencing the benefits of learning from our platform that is allowing our newer partners to perform at the high end of our range.

* * *

I think in general, we figure like – we feel like we're seeing an acceleration sooner for our year-1 markets in terms of the benefits of the high-touch model, and it's coming through in terms of better satisfaction, better health outcomes and ultimately lower costs and better margins overall. So those are the things that I would really call out.

114.    On January 9, 2023, during an investor presentation at the JP Morgan Healthcare

Conference, Defendant Sell touted the Company's "incredible growth" and stated that "[i]n 2022, we stepped up both medical margin and adjusted EBITDA substantially." During the presentation, Defendant Sell provided fiscal year 2023 adjusted EBITDA guidance of $75 million to $90 million (compared to $4 million in 2022).

115.   On January 24, 2023, the Company issued a press release, co-written by Defendant Hittner, which highlighted the purported benefits of the Company's platform:

> The agilon model integrates multi-payer claims data and clinical electronic medical record (EMR) data to create a comprehensive picture of each patient's needs and gaps in care, such as the need for screening or follow-up diagnostic exams, labs, or medication titration. Data is aggregated from all contracted MA plans, along with Medicare FFS ACO REACH, so each PCP can see a single view of their panel of Medicare patients.

116.   On March 1, 2023, the Company announced its fourth quarter and full year 2022 financial results, reporting $305 million in medical margin, $4 million in adjusted EBITDA, and $107 million in net loss. The Company provided fiscal guidance for 2023, including medical margin guidance of $535-$560 million and adjusted EBITDA guidance of $75-$90 million.

117.   Also on March 1, 2023, the Company filed its 2022 annual report on Form 10-K (the "2022 10-K"), which was signed by Defendants Sell, Bensley, Kasenchak, Williams, Sachdev, Mansukani, Richards, Schnall, Schwaneke, Strum, Wulf, and McLoughlin. The 2022 10-K disclosed the following risks:

> We have a history of net losses, we anticipate increasing expenses in the future, and we may not achieve or maintain profitability . . . These expenses may prove to be more significant than we currently anticipate, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business.

> * * *

> [F]actors that impact medical costs incurred by our members, and medical expenses we incur, may be subject to fluctuations which we may not be able to control. Such factors include the following . . . The utilization rates of healthcare services,

31

including inpatient hospitalization, by our members.

* * *

Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims and earnings pursuant to payor contracts could be inaccurate.

* * *

[O]ur actual medical claims liabilities for a particular quarter or other period could differ significantly from the amounts estimated and reserved for that quarter or period.

* * *

Our estimates of [medical services that have been incurred but not reported] liabilities may be inadequate in the future, which would negatively affect our results of operations for the relevant time period. Furthermore, if we are unable to accurately estimate adequate [medical services that have been incurred but not reported] levels, our ability to take timely corrective actions may be limited, further exacerbating the extent of the negative impact on our results.

118.    On March 30, 2023, during the Company's 2023 Investor Day, Defendant Bensley justified the Company's ambitious 2023 fiscal guidance:

Adjusted EBITDA at agilon is inflecting in a positive way. That's driven by a – that's a function of our accelerating growth, our improving unit economics, our maturing membership base as well as our continuing operating leverage. All of that gives us high confidence in our 2026 outlook for members, medical margin as well as overall profitability. . . . We're well capitalized today, and we expect to be generating positive cash flow in 2024 and beyond.

* * *

So after a significant pickup of $43 million to get to positive adjusted EBITDA in 2022, we're projecting an even bigger inflection of $80 million to get to our 2023 adjusted EBITDA guidance of $75 million to $90 million.

* * *

Medical margins growing at even a faster rate with a 60% CAGR over that same time period. And we expect medical margin dollars to inflect up to about $550 million in 2023. That's an 80% year-over-year increase from what we just reported for 2022. **And I think that's a real hallmark of the agilon model, our ability to**

***grow medical margin at the same time that we're growing membership.***

119.    Defendant Hittner again highlighted the Company's data capabilities:

Across our access for patients, across our quality programs, we have a consistent process and a common operating system that helps us to narrow the variability across different communities, different payers, different EMRs, different partner types ***and individual physicians to be able to create consistent outcome***.

* * *

Now our superpower is our aligned and activated physician network across the country. You combine that with a data set of multiyear, multi-payer, multi-EMR, and now ***our physicians have information they never had before about their entire population.***

120.    On April 14, 2023, the Company filed a Proxy Statement on Form DEF 14A with the SEC (the "2023 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Williams, Strum, McLoughlin, and McKenzie to serve another three-year term on the Company's Board and the compensation of certain of the Company's executive officers, including Defendants Sell, Bensley, and Venkatachaliah.

121.    With respect to risk oversight, the 2023 Proxy stated:

Our board of directors as a whole has responsibility for overseeing our risk management. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by reports from our management team and from our internal audit department that are designed to provide visibility to the board of directors about the identification and assessment of key risks and our risk mitigation strategies. The full board of directors has primary responsibility for evaluating strategic and operational risk management, and succession planning. Our Audit Committee has the responsibility for overseeing our major financial and accounting risk exposures and the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk. Our Compensation and Human Capital Committee evaluates risks arising from our compensation policies and practices, as more fully described below. Our Compliance and Quality Committee evaluates risks arising from our compliance with regulatory and legal requirements that pertain to the conduct of the day-to-day operations of our businesses (such as those dealing with Medicare, patient confidentiality, and other healthcare regulatory matters) and meets regularly with our chief compliance officer. The Audit Committee, Compensation and Human

Capital Committee, and Compliance and Quality Committee provide reports to the full board of directors regarding these and other matters.

122.    The 2023 Proxy stated the following with respect to the Audit Committee's role regarding oversight of the Company's internal controls and financial reporting processes:

> Our Audit Committee is responsible, among its other duties and responsibilities, for overseeing our accounting and financial reporting processes, the audits of our financial statements, the qualifications and independence of our independent registered public accounting firm, the effectiveness of our internal control over financial reporting and the performance of our internal audit function and independent registered public accounting firm. Our Audit Committee is responsible for reviewing and assessing the qualitative aspects of our financial reporting, our processes to manage business and financial risks, and our compliance with significant applicable legal, ethical and regulatory requirements. Our Audit Committee is directly responsible for the appointment, compensation, retention and oversight of our independent registered public accounting firm.

123.    The statements in the 2023 Proxy were materially false and misleading because they failed to disclose the Company's increasing utilization rates and medical costs, the Company's failure to adequately onboard new physicians, and the Company's significant data and visibility gaps. Further, despite the 2023 Proxy's descriptions of the Board's and its committees' oversight responsibilities with respect to risk management and internal controls over financial reporting, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to issue false and misleading statements.

124.    On May 9, 2023, the Company announced financial results for its first fiscal quarter of 2023, affirming the Company's fiscal year 2023 guidance with respect to medical margin and adjusted EBITDA. The Company disclosed that its estimates of adjusted EBITDA were now including geography entry costs to comply with recent SEC guidance. With the new methodology, the Company's fiscal year 2023 adjusted EBITDA guidance was revised to a range of ($3 million) to $25 million.

125.    During an investor conference call the same day, Defendant Sell discussed the

Company's "long-term growth" strategy of adding physicians in mature markets, explaining that "once the infrastructure for full risk is established in a community, other doctors can easily join our network and access a new and sustainable model for primary care."

126.    Also on May 9, 2023, the Company filed a quarterly report on Form 10-Q for the first quarter of 2023, which repeated the materially false and misleading statement concerning the Company's business model that was contained in the April 2021 Registration Statement identified above in ¶74.

127.    On May 11, 2023, at the Bank of America Global Healthcare Conference, Defendant Bensley claimed that agilon's model was "improving the quality" of medical services for patients while "driv[ing] cost down":

> [T]he numbers that we've seen coming through Q1, as we exited active numbers we've seen exiting 2022 and as we've now completed Q1, are very much right on track with what we expected across our markets cohorts for delivering 2023 and being ready to transition to 2024. . . . [O]ur model is so geared to improving the quality and outcome for our patients that actually drives cost down.
>
> When there is a pretty good high benchmark year, the differential between that benchmark revenue rate and what we're doing in cost just gets wider. And so that drives a higher point of inflection because our costs continue to just go in the right direction because of all the things that Kenny [Bellendir, agilon's Markets CFO] was talking about.

128.    In May 2023, the Company again filed offering documents in connection with an SPO, including a Registration Statement on May 15, 2023 and a prospectus on May 17, 2023 (the "May 2023 Registration Statement" and the "May 2023 Prospectus," collectively referred to herein as the "May 2023 Offering Documents"). In the May 2023 SPO, CD&R sold over $1.95 billion in agilon common stock at $20.80 per share, including 9.6 million shares that CD&R caused agilon to purchase from CD&R.

129.    The May 2023 Registration Statement incorporated the 2022 10-K and the 1Q23

10-Q and repeated the materially false and misleading statement concerning the Company's business model that was contained in the April 2021 Registration Statement identified above in ¶74.

130.    On June 7, 2023, during the William Blair Growth Stock Conference, Defendant Bensley highlighted the Company's strong visibility into future growth:

> And we also have a process in which we implement our new markets up to 12 months before going live. So long before we go live, we have really, really strong visibility into exactly what's happening. So right now, for the class of 2024, we're already implementing those partners, and we have good visibility into not only what that membership is but what the economics for that cloud will look like going into 2024.
>
>                                    * * *
>
> So as our members and our partners mature on the agilon platform, margins grow over time. And as Steve said, I'll show you a really great slide as exactly how that's been working in practice. So we have really great confidence and visibility in our long-term value drivers. And right now, our EBITDA has actually been inflecting positive year-over-year.

131.    Also during the conference, Defendant Sell touted the Company's growth, stating "I don't know many businesses that show an 88% step-up in their main margin metric [medical margin]. We're tripling our adjusted EBITDA year-over-year while we're growing 60-plus percent."

132.    On August 3, 2023, the Company announced financial results for its second fiscal quarter of 2023 in a press release, reporting $138 million in medical margin, $10 million in adjusted EBITDA, and $17 million in net loss for the quarter (the "2Q23 Release"). The 2Q23 Release quoted Defendant Sell as stating that "[t]he durability and predictability of our partnership model enabled agilon to deliver strong performance during the second quarter and first half of 2023."

133.    In the 2Q23 Release, the Company revised its fiscal year 2023 medical margin

guidance downward from a range of $535-$560 million to a range $500-$530 million. At the same time, the Company raised its fiscal year 2023 adjusted EBITDA guidance to a range of 0 to $23 million.

134.   During an investor conference call the same day, Defendant Sell touted the Company's 69% growth in medical margin year-over-year and explained that agilon's "profitability gains [were] even more outsized on an underlying basis" because "MA included a net $7 million headwind from prior year claims and revenue, with about half of this flowing to adjusted EBITDA."

135.   During the call, Defendant Sell claimed that agilon's model "insulated" the Company from the impacts of increased utilization rates:

> One theme I would like to drive home, given all of the speculation on utilization trends is that different models will yield different outcomes. agilon's model is distinctively different and more durable and predictable in driving cost and quality results compared to the broad fee-for-service system, which predominates across health care today.

> Let me highlight how we are producing such strong and predictable results and what drives our forward confidence in the business. First, at agilon, we only take risk on patients that have an aligned long-term relationship with a PCP, who has both the resources to positively impact total cost and quality of care. We do not take risk on a broad set of patients in an unmanaged fee-for-service system. Our high-touch PCP led model allows partner physicians to actively manage the health of a discrete set of senior patients they have often known for decades.

> * * *

> We believe this high-touch approach has prevented a pent-up demand for care and insulated agilon from any associated spikes in utilization.

136.   Defendant Sell added the following regarding the Company's expected utilization rates:

> Second point on differentiation. For our members, our year-to-date composite utilization trend is in line or better than our expectations. Year-to-date, we have driven very moderate ER and inpatient trends, with utilization flat to down in the

mid-single-digit range, while primary care and outpatient utilization is up in the mid- to high single-digit range. Given that we manage the full premium dollar in a total care relationship, we focus on the composite utilization trend and are comfortable and actively encouraging this mix shift.

All of the clinical programs we shared with you at our Investor Day are oriented towards moving care closer to primary care while significantly reducing unnecessary ER and hospital utilization, and they are tracking ahead of our expectations year-to-date.

137.    During the call, Defendant Sell continued to highlight the Company's visibility:

Third, our model has natural advantages in terms of leading indicators and visibility. From an operational standpoint, we are not just receivers of macro utilization trends. Our teams are actively managing utilization on the ground every day. This includes transition of care nurses, post-discharge follow-up visits and high-risk case managers. Additionally, while MA claims data has some lag, our REACH claims data is very current through May, which is more than 90% complete. We have not seen any meaningful change in our expected cost trend, including outpatient procedures.

138.    Defendant Sell continued, stating the following with respect to the "predictability"

of agilon's business model:

Lastly, our 50-50 surplus sharing not only creates strong alignment in driving long-term positive patient outcomes, but it also buffers our financial results up and down. As a result, *we are able to guide to relatively tight ranges on medical margin and adjusted EBITDA* and absorb puts and takes that may arise during a given period.

* * *

Ultimately, *the durability and predictability of our model* has enabled agilon to raise our adjusted EBITDA outlook during 2023 and set a strong foundation for 2024, even as some health plans with broad fee-for-service networks are seeing pockets of higher costs. Our success in 2023 sets the table for strong performance in 2024, which should be another year of meaningful step-up in profitability. As we have discussed previously, we operate in a very forward-looking model. *And our visibility on the key levers for driving next year's performance is quite high.*

* * *

Our confidence in 2024 is also bolstered by the combined strength of our run rate medical margin performance across MA and REACH in 2023. This is inclusive of the adjustment to our MA reserving approach, which was a proactive decision on our part and supported by the magnitude of the upside we are seeing in REACH.

> On a combined basis, our underlying margins for MA and REACH are tracking slightly better than our expectations. This is obviously important as you think about the stepping off point for 2024.

139.   Also on August 3, 2023, the Company filed a quarterly report on Form 10-Q with the SEC, which reported the same financial results that were contained in the 2Q23 Release and repeated the false and misleading statement concerning the Company's business model that was contained in the April 2021 Registration Statement identified above in ¶74.

140.   On September 6, 2023, during the Wells Fargo Healthcare Conference, Defendant Bensley was asked about utilization rates. In response, Defendant Bensley failed to disclose the significant utilization spike in May and June 2023 and instead claimed that the Company's "power[ful]" model was "driv[ing] utilization down":

> [O]bviously, there has been a lot of focus on utilization coming through the first half of the year. And I think this current environment really gives us the opportunity to demonstrate the power of the agilon model. I know that sounds like it's simple, but *our model is essentially designed to have a more efficient and really more consistent impact on utilization than probably just any other model out there,* just certainly the normal fee-for-service environment.
>
> * * *
>
> But the second thing is we're bringing this platform that allows the – or helps the primary care physician, both identify and bring the right care to their patients that then essentially over time does have that kind of leveling impact on utilization. *It also helps us drive utilization down* below what the overall, I think, fee-for-service environment would be.
>
> * * *
>
> What we have much better continuity of care. We're handling the conditions of our patients on a more ongoing basis and basically managing them on a proactive basis as they happen. I think that has the impact of both *lowering utilization* as well as having more consistent utilization over time. It may even have a positive impact on *avoiding some of the pent-up demand issues that came out of post-COVID.*
>
> Having said that, you can see the results in our numbers. So when we came out and talked about Q2, we said that we're not only seeing – that we're beating kind of the average utilization on the inpatient side. And by the way, of course, inpatient is by

far the largest part of our cost basis. We're actually seeing an actual single-digit decrease in inpatient utilization against our population that we reported in Q2.

Now at the same time, of course, we have been seeing pretty large increases in outpatient. That's a smaller portion of the overall cost pie. And so the inpatient decrease is more than offsetting that.

141.    On September 12, 2023, at the Morgan Stanley Healthcare Conference, Defendant

Bensley reiterated that the Company was "seeing [] an absolute decrease in patient utilization":

Yes. I mean, we haven't given a kind of inter-quarter update. We'll give one here in a bit when obviously we report Q3. It was interesting when we were coming through Q2 that's where we started to – and everyone else are to hear some commentary from the big payers that, hey, there may be some kind of a spike going on utilization. Of course, when we reported Q2, we hadn't seen that in our numbers yet. And in fact, our performance is more along the lines of what Steve was saying. But even in that higher rate environment or even potentially, I'm sorry, in that *higher utilization environment, we were pretty encouraged obviously by the overall trends that we're seeing in an absolute decrease in patient utilization*. Mean we are seeing, and we have been seeing, just like everybody else was talking about an increase in outpatient, but that's not really new to us, right?

We've been talking about that now for a number of quarters even coming through last year that there's been some shift, I think, going on in terms of side of service for procedures from inpatient to outpatient. But the overall decrease in inpatient, which is by far the largest bucket of cost for us has obviously been offsetting that. So – but the second thing that we did, of course, coming through that and hearing that commentary from the payers was we also strengthened our reserves for somewhat in Q2 and then also in our guidance for balance of the year, with the understanding that if there – *if we do that at some point, see that, that – there was some kind of a spike up or an increase in utilization* that we're adequately covered for that within the reserves that we put out there and the guidance that we put out there.

And all of that, notwithstanding any commentary from the payers and utilization leads us to believe we're well reserved and we feel really confident with the guidance – with that guidance that we put forward for the balance of the year.

### The Truth Gradually Emerges

142.    On November 2, 2023, the Company announced financial results for its third fiscal

quarter of 2023 in a press release, reporting $108 million in medical margin, ($6 million) in

adjusted EBITDA, and $31 million in net loss for the quarter (the "3Q23 Release"). In the 3Q23

Release, the Company maintained its fiscal year 2023 medical margin guidance of $455 to $470 million and its fiscal year 2023 adjusted EBITDA guidance of $6 to $18 million.

143.    The same day, during an investor conference call, Defendant Sell and Bensley admitted that, despite contrary assertions in the 2Q23 Release and during the related investor conference call, the Company had experienced a surge in utilization rates and medical costs beginning in May 2023. Despite this disclosure, the Individual Defendants continued to mislead shareholders and the public. For instance, during the call, Defendant Sell reassured investors that "[a]ll of [the Company's] key financial metrics were generally in line or above our guidance ranges," and that agilon's "results continue to demonstrate the unique power of our model to inflect profitability while driving significant growth."

144.    Defendant Sell continued, representing that, despite the spike in utilization rates and medical costs during the second quarter, utilization and costs have since decreased:

> From a utilization perspective, composite utilization was in line with our overall expectations. As Tim kind of outlined, *we did see a step-up in Q2 utilization* in MA and REACH. The MA was within our guide, REACH actually developed favorably relative to sort of what our expectation was around that intra-period. *In Q3, we've seen a deceleration.* And our guide makes an assumption on utilization that will be flat through the end of the year, and that's reflected in the reserve [posture] that Tim talked about in terms of an extra $3 million.

145.    Defendant Bensley confirmed that utilization rates have "greatly started to moderate":

> In terms of the utilization trend, remember last quarter when we talked about this, we said, hey, we haven't seen the spike up yet. We didn't have enough information from May or June to really see what some of the payers were referring to. We did want to make sure that we had covered the possibility that there would be some higher utilization in our guidance going forward. As it turned out, as we just reported, we did see some increased utilization in May that was – greatly started to moderate in June. And as we've seen so far, started to – continued to moderate in early Q3 as well.
>
> I'm not completely surprised by that. Compared to some of the comments that I've

made from some of the big payers, I mean I think our model and even some of them
have said should be performing better than the average out there. So the fact that
we saw a spike up and some moderation down is probably just a factor also of the
strength of our model.

146.   On this news, the price of agilon stock declined 13% from a close of $16.89 per

share on November 2, 2023 to $14.66 per share on November 3, 2023. The price of agilon stock

declined another 11% on November 6, 2023, closing at $13.11 per share.

147.   On November 14, 2023, during the Wolfe Research Healthcare Conference,

Defendants Bensley and Sell continued to issue false and misleading statements regarding

utilization rates and the Company's business, operations and prospects. For instance, during the

conference, Defendant Bensley maintained that utilization rates were declining, stating that "as we

came through July and June, those same [utilization cost] categories continue to moderate –

moderated back down" and adding that "[w]e didn't see like a huge spike up in utilization that's

continue[d] . . . all 3 of them moderated back down."

148.   Also during the conference, Defendant Sell represented that the Company was

experiencing significant growth in both Medicare Advantage patients and new physician groups,

referring to agilon's class of 2025 membership as "large" and comparable to the Company's "class

of 2024," which consisted of 140,000 new Medicare Advantage members.

149.   On January 5, 2024, the Company issued a press release, revealing that the

Company had significantly higher prior medical expenses than previously disclosed and lowering

the Company's fiscal year 2023 guidance. Specifically, the Company lowered its fiscal year 2023

medical margin guidance by 36% to a range of $340 to $360 million and substantially lowered its

adjusted EBITDA guidance from a range of $6 to $18 million to a *loss* in the range of $55 to $69

million.  The Company further disclosed:

> During 2023, agilon health experienced an ***increase in medical expenses***

attributable to higher-than-expected specialist visits, Part B drugs, outpatient surgeries, and supplemental benefits, partially offset by lower hospital medical admissions. ***While a number of programs have been launched to improve visibility***, balance risk-sharing and enhance predictability of results, management has assumed higher costs will continue into 2024.

150.    The Company additionally revealed that its previously reported medical margin for the third quarter of 2023 of $108 million had been overstated by at least $31 million, and its true medical margin for that quarter was flat compared to the same fiscal period of the prior year. Similarly, the Company's medical costs for its second fiscal quarter of 2023 were understated and, despite previously reporting 69% year-over-year growth in medical margin for that quarter, the Company's second quarter 2023 medical margin had actually remained relatively flat compared to the same period of the prior year.

151.    The Company further provided fiscal year 2024 guidance that was highly disappointing, including medical margin of $560-$600 million and adjusted EBITDA of $40-$60 million.

152.    The Company also revealed that agilon's medical margins were adversely impacted by the Company's failure to adequately onboard and educate new physicians that had joined agilon's mature markets. The Company stated that it would incur additional costs moving forward to implement adequate onboarding and training for its new physicians.

153.    Lastly, the Company announced the resignation of Defendant Bensley as CFO of the Company.

154.    During an investor conference call the same day, Defendant Sell explained that agilon was experiencing "cost trends that were 2 to 3x higher [than] what we had seen in 2022 in key areas like specialist costs, outpatient surgeries and Part B drugs." Defendant Sell further acknowledged that the heightened utilization rates, which would "persist through 2024," were a result of a "backlog of pent-up demand from COVID."

155.    On this news, the price of agilon stock plummeted 29%, from a close of $12 per share on January 4, 2024 to $8.63 per share on January 5, 2024.

156.    On February 27, 2024, the Company reported its fourth quarter and full year 2023 financial results and disclosed that: (i) the Company underreported its fourth quarter 2023 medical costs by $38 million; (ii) the Company had experienced an additional $13 million in previously undisclosed medical costs from prior to the fourth quarter of 2023; (iii) the Company overstated its fiscal year 2023 medical margin by $41 to $61 million; and (iv) during fiscal year 2023, the Company suffered a net loss of $263 million and adjusted EBITDA of negative $95 million. The Company additionally revised the fiscal year 2024 guidance that it had provided just seven weeks earlier, lowering its medical margin guidance by 25%-29% and its adjusted EBITDA guidance by 125%-250%.

157.    During an investor conference call the same day, the Company revealed that it had suffered from "data visibility gaps" and had taken steps to address the issue.

158.    In the Company's annual report, filed on Form 10-K with the SEC the same day, agilon revealed a previously undisclosed material deficiency in the Company's internal controls over financial reporting:

Management has identified a material weakness in controls related to the completeness and accuracy of information produced by the entity (IPE) and the level of precision and documentation around its management review controls to address the IPE for medical claims and related payables, risk adjusted premium revenue and certain care management expenses.

\* \* \*

In 2023, we identified certain sources of information utilized in our medical claims and related payables, risk adjusted premium revenue, and care management expense processes that contained specific data attributes utilized in executing an internal control by management. Management did not sufficiently design controls or control activities to ensure the completeness and accuracy of the related IPE in executing certain controls associated with these processes.

159.   As a result of the February 27, 2024 disclosures, the price of agilon common stock declined 7% to a close of $6.04 per share on March 1, 2024.

**Stock Repurchases**

160.   During the Relevant Period, the Individual Defendants caused the Company to repurchase shares of its common stock at prices that were artificially inflated due to the Individual Defendants' false and misleading statements.

161.   According to the Company's public filings, the Individual Defendants caused the Company to purchase 9.6 million shares of its common stock on May 18, 2023 at an average price of $20.80 per share. As the price of the Company's stock after the corrective disclosures was $6.04, the Company overpaid by roughly $14.76 per share, or approximately $141.7 million for the repurchase of these 9.6 million shares.

**Insider Sales**

162.   During the Relevant Period, Defendants Sell, Mansukani, Wulf, and Smith (the "Insider Trading Defendants") each made unusually timed sales of Company stock while in possession of material non-public information concerning the Company's financial condition and business prospects.

163.    The Insider Trading Defendants collectively reaped millions of dollars in profits selling their personal holdings of Company stock at prices that were artificially inflated as a result of the false and misleading statements issued by the Individual Defendants.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

164.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

165.    agilon is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

166.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

167.    Plaintiff is an owner of agilon stock and has been a continuous holder of the Company's common shares at all relevant times.

168.    At the time this action was commenced, the eight-member Board was comprised of Defendants Sell, Williams, Sachdev, Battaglia, Mansukani, McKenzie, McLoughlin, and Wulf. Accordingly, Plaintiff is only required to show that four directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

169.    The Individual Defendants, together and individually, violated and breached their

fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

170.    The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

171.    As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of agilon, the Individual Defendants knew, or should have known, the material facts surrounding the Company's utilization rates and medical costs, its data and visibility gaps, and the adequacy of the Company's physician training programs.

172.    Defendant Williams is not disinterested or independent and is therefore incapable of considering a demand. Defendant Williams co-founded the Company and serves as the Chairman of the Board. Thus, the Company admits that Defendant Williams is a non-independent director.

173.    Defendant Sell is not disinterested or independent and is therefore incapable of

considering a demand. Defendant Sell serves as the Company's CEO and President. Thus, the Company admits that Defendant Sell is a non-independent director.

174. Furthermore, Defendant Sell is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

175. Defendants McKenzie, McLoughlin, and Wulf (the "Audit Defendants") serve as members of the Audit Committee and, pursuant to the Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

176. Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Individual Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Individual Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of agilon stock and stock options they held.

177. The Individual Defendants, as members of the Board, were and are subject to the

Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to agilon's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

178.    Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Significantly, none of the Individual Defendants have taken remedial action to redress the conduct alleged herein. For instance, none of the Individual Defendants have sought to enforce agilon's Incentive Compensation Clawback Policy, which provides for "the adjustment or recovery of certain incentive awards or payments made to current or former executive officers in the event that [the Company is] required to prepare an accounting restatement due to material noncompliance with any financial reporting requirement under the securities laws."

179.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment

about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

180.    The acts complained of herein constitute violations of fiduciary duties owed by agilon's officers and directors, and these acts are incapable of ratification.

181.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of agilon. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of agilon, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

182.    If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause agilon to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

183.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I

### Against the Individual Defendants for Violations of § 14(a)
### of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)

184.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

185.    The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

186.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2022 Proxy and the 2023 Proxy filed with the SEC. As alleged above, these filings contained materially false and misleading statements concerning the Company's utilization rates and its internal controls over financial reporting.

187.    The 2022 Proxy was used to solicit shareholder votes in connection with the election of Defendants Schnall, Mansukani, Smith, and Richards to serve for another three-year term on the Company's Board. In addition, the 2022 Proxy was used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Sell, Bensley, and Venkatachaliah. While the shareholder vote was non-binding, the 2022 Proxy indicated that "our board of directors and the Compensation and Human Capital Committee value the opinions of our stockholders and will carefully consider the outcome of the vote when making future compensation decisions for our named executive officers."

188.    Similarly, the 2023 Proxy was used to solicit shareholder votes in connection with the election of Defendants Williams, Strum, McLoughlin, and McKenzie and the compensation of, *inter alia*, Defendants Sell, Bensley, and Venkatachaliah.

189.    Describing the Company's "Compensation Philosophy and Objectives," the 2022

Proxy and the 2023 Proxy both indicated that compensation is performance-based, stating that one objective of the Company's compensation programs is to "reward our executives commensurate with their performance, experience, and capabilities."

190.     The materially false and misleading statements contained in the 2022 Proxy and the 2023 Proxy regarding the Company's utilization rates and internal controls over financial reporting therefore misleadingly induced shareholders to vote in favor of the election of Defendants Schnall, Mansukani, Smith, Richards, Williams, Strum, McLoughlin, and McKenzie and performance-based compensation to Defendants Sell, Bensley, and Venkatachaliah, to which they were not entitled.

191.     The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT II

### Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

192.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

193.     The Individual Defendants participated in a scheme with the purpose and effect of defrauding agilon. Not only is agilon now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon agilon by the Individual Defendants.

194.     The Company repurchased 9.6 million shares of its common stock on May 18, 2023 at prices artificially inflated by the materially false and misleading statements and material omissions described above.

195.     During the Relevant Period, the Individual Defendants also individually and in

concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

196.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about agilon not misleading.

197.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by agilon.

198.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

199.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT III

### Against the Individual Defendants for
### Breach of Fiduciary Duties

200.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

201.   The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

202.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

203.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

204.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide

damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

205.    Plaintiff, on behalf of agilon, has no adequate remedy at law.

**COUNT IV**

**Against the Insider Trading Defendants**
**For Breach of Fiduciary Duties (*Brophy* Claim)**

206.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

207.    During the Relevant Period, the Insider Trading Defendants held positions with the Company that provided them access to confidential, proprietary information concerning the Company's financial condition and future business prospects.  Notwithstanding their duty to refrain from trading in agilon common stock under the circumstances, the Insider Trading Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

208.    The insider sales detailed herein were not part of any regular pattern of sales for the Insider Trading Defendants and were suspicious in terms of timing and amount.

209.    The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold agilon stock. At the time of their stock sales, the Insider Trading Defendants were aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease.  The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

210.    Plaintiff, on behalf of agilon, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

211.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

212.    By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

213.    Plaintiff, on behalf of agilon, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Unjust Enrichment

214.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

215.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of agilon.

216.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from agilon that was tied to their performance or to the artificially inflated valuation of agilon.

217.    The Insider Trading Defendants were further unjustly enriched with respect to

insider sales of Company stock.

218.     Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

219.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

220.     Plaintiff, on behalf of agilon, has no adequate remedy at law.

## COUNT VII

### Against the Individual Defendants
### for Waste of Corporate Assets

221.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

222.     The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of agilon's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

223.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Class Action, and approving performance-based compensation linked to the Company's perceived successes.

224.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

225.    Plaintiff on behalf agilon has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 2, 2024

**THE BRISCOE LAW FIRM, P.C.**

*/s/ Willie C. Briscoe*
Willie C. Briscoe
Texas Bar No. 24001788
12700 Park Central Drive, Suite 520
Dallas, TX 75251
Telephone: (972) 521-6868
Facsimile: (346) 214-7463
Email: wbriscoe@briscoelawfirm.com

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683.3516
Facsimile: (302) 654-7530
Email: tjm@rl-legal.com
Email: sa@rl-legal.com

*Attorneys for Plaintiff*

Docusign Envelope ID: F669430C-C05A-453F-8D4D-3948783703C1

## <u>VERIFICATION OF JULIE BINGHAM</u>

I, Julie Bingham, am a plaintiff in this action.  I have reviewed the allegations made in the

Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing.

As to those allegations of which I have personal knowledge, I believe those allegations to be true.

As to those allegations of which I do not have personal knowledge, I rely upon my counsel and

their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____9/19/2024_____

DocuSigned by:

_____
820F901060BD4ED...
Julie Bingham